## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL DOMINGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 19 C 5327 |
| | ) | |
| PARK CITY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendants Park City, Richard Svejcar, Allen Manders, Kenneth Stoves, and Douglas Sauer's (together, "Defendants")[1] Motion for Summary Judgment. For the following reasons, the motion is granted in part and denied in part.

### BACKGROUND

This civil rights action brought against Park City and the Defendant Officers under 42 U.S.C. § 1983 and state law arises from events that took place in the booking room of the Park City police station after Dominguez was arrested on suspicion of driving under the influence. Dominguez alleges that at various times throughout the early morning of September 2, 2018, each of the Defendant Officers used excessive force against him and failed to intervene after witnessing other officers using excessive force. Dominguez also brings a claim for intentional infliction of emotional distress.

---

[1] The individual defendants are referred to collectively as the "Defendant Officers."

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant.[2] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.

On September 2, 2018, shortly after midnight, Dominguez was driving home from a bar when Officer Manders pulled him over on suspicion of driving under the influence. Dominguez provided Officer Manders with his license, took a field breathalyzer test, and performed field sobriety tests. Dominguez's portable breathalyzer test reflected a breath alcohol concentration ("BAC") of .240, although Dominguez disputes that this was an accurate reading. Dominguez was transported without incident to the police station so that another breathalyzer test could be performed.

Two videos from cameras in the station's booking room show much of what followed, although there is no audio available. One video shows the view from the booking room evidence door, and the other is a desk view. The relevant portions of the videos are recounted below as neutrally as possible.

---

[2] "A twist on the usual standard of review is at play here: When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007)); *see also Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge in stories clearly contradicted by the footage.").

At around 12:44 AM, Dominguez was placed in the booking room and Officer Manders uncuffed him. Dominguez performed additional field sobriety tests, which he failed. Officers attempted to administer a breathalyzer test on three separate occasions. Dominguez refused to comply with the tests. After Dominguez's third incomplete breathalyzer test, his refusal was registered and the Defendant Officers did not ask him to complete another test. Video of the breathalyzer tests shows that Dominguez was handed the mouthpiece and he raised it to his mouth, although Dominguez testified that the Defendant Officers "were literally shoving the breathalyzer into [his] mouth." Dkt. # 56, ¶ 11.

After the second attempt at administering a breathalyzer test, the Defendant Officers told Dominguez that he needed to be fingerprinted. Dominguez asked for an attorney on multiple occasions throughout the evening, including before taking an additional breathalyzer test and before the Defendant Officers' attempts to fingerprint him. Dominguez testified that he explained "over and over again" that he would not provide fingerprints before speaking with an attorney. The Defendant Officers repeatedly told him that they would keep him handcuffed until he submitted to fingerprinting.

Dominguez testified that throughout his time in the booking room, the Defendant Officers called him vulgar names, accused him of being involved in gang activity, and asked what he was hiding. Dominguez further testified that the Defendant Officers

3

threatened to sexually assault his wife in front of him if he did not cooperate. Defendants vehemently deny these accusations.

Dominguez focuses on three separate "sequences of force": the first beginning at around 1:53 AM, the second at around 2:40 AM, and the third at around 4:37 AM.[3]

### The "1:53 AM Sequence of Force"

At around 1:53 AM, Commander Stoves and Officer Svejcar entered the booking room. Commander Stoves uncuffed Dominguez and escorted him to the bathroom. Officer Svejcar stood by the bathroom door while Dominguez was inside. Officer Svejcar reached into the bathroom, grabbed Dominguez's left wrist, and yanked him out. This caused Dominguez to stumble into a chair while Officer Svejcar forcibly pulled Dominguez over to the fingerprint area. At the fingerprinting station, Commander Stoves and Officer Svejcar each grabbed one of Dominguez's arms. Dominguez can be seen clenching his fists and refusing to let Commander Stoves and Officer Svejcar guide his arms toward the fingerprint machine. Commander Stoves and Officer Svejcar continued holding Dominguez's arms and briefly took him back to the bench while Officer Manders readied the fingerprint machine. At around 1:55 AM, Commander Stoves and Officer Svejcar continued to hold Dominguez's arms as they brought him back to the fingerprinting machine.

At around 1:56 AM, in front of the fingerprinting machine, Dominguez again had clenched fists and resisted the Defendant Officers' attempts to manipulate his arms

---

[3] Only the second and third "sequences of force" are mentioned in Dominguez's complaint.

toward the machine. Officer Svejcar yanked and twisted Dominguez's arm and pushed it upwards, trying to pry apart Dominguez's clenched fist. Dominguez continued to resist, not allowing the officers to pull his arm away from his body. One minute later, at around 1:57 AM, Officer Manders and Commander Stoves brought Dominguez back to the bench and pushed him into a seated position, which Dominguez says caused his head to hit the wall. Defendants deny Dominguez hit his head, and while the video clearly shows Dominguez's back hitting the wall, it is unclear whether his head also hit the wall. Dominguez was again handcuffed to the bench.

### The "2:40 AM Sequence of Force"

At around 2:40 AM, Dominguez, uncuffed, walked over to the fingerprint machine with his arms crossed and his hands hidden under his arms. He again refused to allow fingerprinting, so Officer Svejcar put his hand on Dominguez's back and led him back to the bench. Officer Svejcar reached for the handcuffs, but Dominguez, still standing, kept his arms folded, and refused to give Officer Svejcar his arm to be handcuffed. While Officer Svejcar pulled on Dominguez's arm, he pushed Dominguez against the wall and pulled him forward again.

A few seconds later, Officer Svejcar punched a still-standing Dominguez in the face. Officer Svejcar pushed Dominguez to his side so that he was briefly in a horizontal position, then pulled him back up to a seated position, continuing his attempt to free Dominguez's arm for the handcuffs. At 2:41 AM, Dominguez put his hand on Officer Svejcar's hip and then his arm, though it does not appear that there was any

significant force behind this contact. After another few seconds of struggling to handcuff Dominguez, Dominguez stood up and Officer Svejcar put his hand on Dominguez's chest and pushed him up against the wall. Officer Svejcar held Dominguez in this position for a few seconds before reaching back down for the handcuffs. Officer Svejcar reached for Dominguez's right hand and then went back to Dominguez's left arm. Dominguez pulled his arm closer to his body, keeping it stiff. Dominguez then stood up. Officer Svejcar pushed Dominguez against the wall and punched him in the face. Officer Svejcar's body blocks the view of Dominguez's body, so it is unclear what Dominguez did in reaction to the punch, or if he did something to provoke the punch. Officer Svejcar then administered what looks like two additional strikes and held Dominguez's head down and to the side while he reached for the handcuffs. Dominguez was held in that position for a few seconds.

At approximately 2:42:41 AM, Officer Svejcar removed his hand from Dominguez's head and Dominguez returned to a full, upright, seated position. Officer Svejcar took out a different set of handcuffs. Officer Svejcar's body blocks Dominguez from view for a few more seconds, and at 2:42:57 AM, Officer Svejcar struck Dominguez again. There was a struggle, and either Dominguez attempted to stand up or Officer Svejcar pulled him to a standing position. Officer Svejcar pushed Dominguez back up against the wall and into a seated position. Dominguez is again blocked from view, and it is unclear what happened for the next three seconds. At 2:43:19 AM, Officer Svejcar stepped to the side and the video shows him using one

6

hand at Dominguez's neck to hold Dominguez back against the wall while he reached for the handcuffs. At 2:43:32 AM, Dominguez was finally handcuffed, and Officer Svejcar released him. Officer Svejcar reached down to pick up the second set of handcuffs, put his glasses back on (which fell off at some point during the struggle), and exited the booking room. Officer Svejcar then called the paramedics who arrived about 14 minutes later. Officer Svejcar was the only officer in the booking room during this encounter.

When describing the altercation, Dominguez testified that he was "just sitting" there and Officer Svejcar "jumped at [him]." Dkt. # 56, ¶ 23. Dominguez testified: "I'm just sitting here doing nothing. There is no altercations. There's nothing. I'm just sitting down." *Id.* ¶ 21. Dominguez testified that he never fought back or did anything other than cross his arms and protect his face and his head. "With no warning he just starts punching me in the face," Dominguez insisted. *Id.* Dominguez also testified, "I know what the word resist means, but you're making it sound like I'm resisting with some term of – some kind of violence and it wasn't like that." *Id.* ¶ 25. Dominguez testified that Officer Svejcar pulled him up to make it look like he was fighting him.

### The "4:37 AM Sequence of Force"

Roughly two hours later, at around 4:37 AM, Lieutenant Sauer and Officer Svejcar attempted to fingerprint Dominguez again. The video shows Dominguez resisting the officers' attempts to manipulate his arms and move them toward the machine. Lieutenant Sauer attempted to pry open Dominguez's clenched fist. Officer

7

Svejcar pulled Dominguez's right arm behind his back while Officer Sauer continued to work on his left hand.

What came next isn't so clear. At some point during the attempted fingerprinting, the officers pulled Dominguez away (or Dominguez pulled them away) from the machine, and either Dominguez pulled Lieutenant Sauer towards the ground or Lieutenant Sauer forced Dominguez down. Either way, Dominguez and Lieutenant Sauer ended up on the ground, with Lieutenant Sauer on top of Dominguez. Defendants claim that Dominguez then punched Lieutenant Sauer in the side, although Dominguez denies punching and it's unclear from the video whether the motion was a punch. As the two officers worked to control Dominguez's arms, Dominguez used his legs to push himself away from the wall and toward the bench. Dominguez continued to try and scoot away from the officers and the struggle continued. At one point Dominguez pushed his arm against one of the officers' chests.

At around 4:38 AM, Officer Manders entered the booking room and deployed his taser three times. Officer Svejcar then administered three strikes to Dominguez's head. At around 4:39 AM, the officers had Dominguez face down on the ground with his hands behind his back. At around 4:40 AM, Dominguez's ankles were cuffed. The three Defendant Officers then exited the booking room, leaving Dominguez on the ground with his ankle cuffed to the bench and his hands cuffed behind his back.

Dominguez testified that he never fought back, and that he was using his legs to try and push himself toward where he believed the camera was. Dominguez does not recall kicking the walls or the lockers.

Based on the events that took place in the booking room, a grand jury returned true bills against Dominguez for three counts of aggravated battery against Officer Svejcar, Lieutenant Sauer, and Officer Manders. All aggravated battery charges against Dominguez were *nolle prosequi'd* by the Lake County State's Attorney, and Dominguez accepted supervision for DUI and probation for one count of reckless conduct.

As a condition of his probation, Dominguez was referred to counseling. Mr. Czapiewski, Domingeuz's therapist and a certified alcohol and drug abuse counselor, testified that (1) a person who is otherwise reasonable and passive can be become unreasonable and aggressive when intoxicated; (2) people who are not combative can become combative when they are intoxicated; and (3) people who are intoxicated can become inconsistent with their thought process. However, Mr. Czapiewski assessed Dominguez and found that he was in the lowest risk category for violence and substance abuse.

Based on the above, Dominguez filed this lawsuit against Park City and the Defendant Officers, bringing claims for excessive force, failure to intervene, and intentional infliction of emotional distress. Defendants now move for summary judgment on all claims.

9

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ. of the City of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh

10

conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704–05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(b)(1), (3).

## DISCUSSION

Defendants move for summary judgment on all counts of Dominguez's complaint. We address each claim in turn.

### I. Compliance with Local Rule 56.1

As a preliminary matter, Defendants' briefing suffers several Local Rule 56.1 violations which significantly hampered review of their motion. Defendants repeatedly violate Local Rule 56.1 throughout their memoranda of law by citing directly to the record rather than their Local Rule 56.1 Statement of Facts. Such a practice is highly improper. *See Mervyn v. Nelson Westerberg, Inc.*, 142 F. Supp. 3d 663, 664–65 (N.D.

11

Ill. 2015) (collecting cases). The Court should not be required to "scour the record and piece together, if that even is possible, the undisputed facts necessary to grant summary judgment in [Defendants'] favor. Defendants also have made the process more burdensome." *FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, 2014 WL 6065817, at *7 (N.D. Ill. 2014).

Additionally, Defendants include a number of facts in their briefing that are not included in their Local Rule 56.1 Statement of Facts. For example, Defendants say that Officer Svejcar and Lieutenant Sauer were attempting to keep their body weight off Dominguez during the struggle on the floor. Dkt. # 51, ¶ 45. Defendants also claim that Dominguez continued to agree to then refuse fingerprinting throughout the evening. *Id.* ¶ 44. Defendants additionally reference "pain compliance" and when that becomes the next option, and claim Dominguez was "drunkenly urinating on the floor." Dkt. # 59, ¶¶ 25, 27. The Court disregards any facts asserted in the briefing that are not presented in the Local Rule 56.1 statements, unless those facts are expressly clear from the video evidence. *See Perez v. Town of Cicero*, 2011 WL 4626034, at *2 (N.D. Ill. 2011) ("Under settled law, facts asserted in a brief but not presented in a statement are disregarded in resolving a summary judgment motion.").

## II. Excessive Force Claims

Defendants make three arguments in their motion for summary judgment with respect to Dominguez's excessive force claims. First, they argue Dominguez's claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Second, they contend

12

the Defendant Officers' use of force was objectively reasonable. And third, Defendants argue that even if the force used was not objectively reasonable, Defendants are entitled to qualified immunity. The Court addresses each argument in turn.

### a. *Heck* Bar

Defendants argue Dominguez's claims are barred by *Heck* because his testimony and theory of the case are inconsistent with his criminal conviction for reckless conduct. In *Heck*, the Supreme Court held that a plaintiff in a civil rights action may not pursue a claim for relief that implies the invalidity of a criminal conviction. 512 U.S. at 486–87. So, when considering whether *Heck* bars Dominguez's excessive force claim, the Court "must consider the factual basis of the claim and determine whether it necessarily implies the invalidity of [Dominguez's] conviction" for reckless conduct. *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014).

To be sure, an excessive force claim is not *per se* inconsistent with a conviction or disciplinary finding that a plaintiff resisted arrest or also used force. *See Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (explaining that excessive force claim does not necessarily imply invalidity of conviction for resisting arrest); *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008) ("*Heck* and *Edwards* do not affect litigation about what happens after the [infraction] is completed."); *Boothe v. Sherman*, 190 F. Supp. 3d 788, 797–98 (N.D. Ill. 2016) (collecting cases holding that *Heck* does not bar all excessive force claims because plaintiff who resists arrest can behave peacefully at another time). While Dominguez need not necessarily admit that Defendants' story regarding his

13

behavior is correct, he may not espouse a version of events that is inconsistent (even by implication) with a criminal conviction for reckless conduct. *See Tolliver v. City of Chicago*, 820 F.3d 237, 244 (7th Cir. 2016); *see also Moore v. Mahone*, 652 F.3d 722, 723–24 (7th Cir. 2011) (noting that plaintiff need not "confess" to any misconduct and may "remain 'agnostic' in his civil case about the findings in the criminal [] proceeding," but *Heck* bars even claims that "necessarily imply" invalidity of conviction).

A person commits "reckless conduct" when he "recklessly performs an act or acts that cause bodily harm to or endanger the safety of another person." 720 ILCS 5/12-5. A person is reckless or acts recklessly when that person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6.

In his complaint and throughout his deposition, Dominguez painted himself as completely innocent of any wrongdoing; he was merely the unfortunate victim of multiple unprovoked attacks. Dominguez repeatedly testified he never fought back, was "just sitting there doing nothing," and was not violent—he was only protecting himself. Dkt. # 56, ¶ 21. When discussing the third altercation, Dominguez did admit to struggling with the Defendant Officers. He denies—or at the very least says he does not recall—punching or kicking any of the officers.

14

Much of Dominguez's testimony is seemingly inconsistent with a conviction for reckless conduct. However, Defendants' *Heck* argument suffers from a fatal defect: on the record before the Court, it is impossible to know what actions formed the basis of the reckless conduct charge and what actions Dominguez admitted to when pleading guilty. Furthermore, Dominguez takes the position that there were three separate instances in which excessive force was used. If the reckless conduct charge only stemmed from Dominguez's actions during the third altercation, Dominguez's allegations with respect to the first two altercations would not necessarily imply the invalidity of his conviction for reckless conduct. Defendants have failed to meet their burden in showing Dominguez's claims are *Heck*-barred.

### b. Constitutional Violation

Claims that a police officer used excessive force in the course of an arrest are subject to the Fourth Amendment's reasonableness standard. *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Law enforcement is a difficult job, as 'police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.'" *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009) (quoting *Graham*, 490 U.S. at 397). Therefore, the "reasonableness" of the use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and the officer's subjective good or bad intentions do not enter into the analysis. *Graham*, 490 U.S. at 396–97. The analysis is "inherently fact-dependent, requiring consideration of

15

such factors as the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2005) (citing *Graham*, 490 U.S. at 396).

The Seventh Circuit has cautioned that "[s]ummary judgment is often inappropriate in excessive force cases" because "the parties typically tell different stories about what happened," *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), and also because "evidence surrounding the officer's use of force is often susceptible to different interpretations," *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). *See Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 n.4 (7th Cir. 2012) ("We certainly agree that summary judgment is frequently inappropriate in excessive force cases."). That said, the plaintiff "bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011) (internal quotation marks omitted).

### i. The "1:53 AM Sequence of Force"

The right to make an arrest necessarily carries with it the right to some degree of physical coercion to effect it. *Graham,* 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* at 396 (internal quotation marks omitted). We find this to be

16

particularly true when it comes to the first alleged "sequence of force." Dominguez was clearly refusing to come out of the bathroom, necessitating some level of force to remove him. Dominguez's claim that Officer Svejcar "threw" him into a chair is unsupported by the evidence and does not take into account his level of intoxication at the time. Yes, Officer Svejcar forcibly pushed or pulled a visibly resisting Dominguez to the fingerprint station. This was not unreasonable. *See Holm v. Vill. of Coal City*, 2008 WL 4371293, at *5 (N.D. Ill. 2008), *aff'd,* 345 F. App'x 187 (7th Cir. 2009) (no excessive force when officer "yanked" the plaintiff or twice pushed him to move towards the police car).

Nor can the Defendant Officers' attempts to free Dominguez's arms and pry apart his fists in order to fingerprint an intoxicated Dominguez be said to be objectively unreasonable. Courts have found the use of varying degrees of force to be justified in a wide variety of settings involving passive resisters and individuals refusing to obey directives. *See, e.g., Cherry v. Washington Cnty., Wis.*, 526 F. App'x 683, 687–88 (7th Cir. 2013) (finding no excessive force where officer pushed the plaintiff to the ground and pressed his face against the road, causing excruciating pain, after the plaintiff disobeyed the officers' instructions to look straight ahead and not turn around); *Brownell v. Figel*, 950 F.2d 1285, 1288 (7th Cir. 1991) ("pen hold" and "mandibular angle pressure hold" not excessive where plaintiff was apparently intoxicated and failed to cooperate in administering a breathalyzer test). Finally, even accepting Dominguez's claim that he hit his head when the Defendant Officers forced him down on the bench,

17

that does not amount to excessive force. *See*, *e.g.*, *Sow v. Fortville Police Dep't*, 636 F.3d at 293, 304 (7th Cir. 2011) (town police officer did not use excessive force in allegedly pushing arrestee into police car, causing arrestee to bump his head).

The Defendant Officers are entitled to summary judgment as to any excessive force claim based on the 1:50 AM "sequence of force," as well as any corresponding failure to intervene claim. Because Commander Stoves was not involved in any of the subsequent alleged uses of excessive force, he is dismissed as a defendant.

### ii. The "2:40 AM Sequence of Force"

The next "sequence of force" involves only Officer Svejcar. For his part, Dominguez does not identify which of Officer Svejcar's actions violated his constitutional rights; he just takes issue with the entire "sequence." This is unhelpful. It is without question that some degree of force is permissible when faced with an uncooperative arrestee, and the video plainly shows Dominguez resisting being handcuffed. Dominguez does not challenge the constitutionality of the handcuffing, nor does he make any effort to explain why Officer Svejcar's attempts to hold Dominguez against the wall while trying to pull his arm toward the handcuffs violated Dominguez's constitutional rights. In the Court's view, given Dominguez's obvious resistance to the handcuffing and refusal to allow Officer Svejcar to pull his arm toward the handcuffs, the only uses of force that could potentially be deemed excessive are the strikes Officer Svejcar administered to Dominguez's head and body during the interaction.

18

Whether an arrestee actively resists arrest is a touchstone of the *Graham* analysis, and there is an important distinction between active resistance and passive refusal to move or follow lawful commands. *Phillips*, 678 F.3d at 524; *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). Defendants have not met their burden of showing that Officer Svejcar's use of force in administering the strikes was objectively reasonable as a matter of law. Defendants claim that "[i]f the initial cuffing was reasonable for purposes of safety, then the controlled strikes delivered by Svejcar when handcuffing was resisted by plaintiff must be an objectively reasonable use of force." Dkt. # 51, ¶ 39. Not necessarily so. "Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force." *Cyrus*, 624 F.3d at 863 (internal citations omitted). "Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times." *Id.*

Defendants point to testimony from Dominguez's therapist, who explained that people who are not typically combative may become so when intoxicated, and a person who is otherwise reasonable and passive can become unreasonable and aggressive when intoxicated. Thus, Defendants say, it was completely reasonable for Officer Svejcar to handcuff Dominguez. It was a matter of safety. But no one is questioning the decision to handcuff Dominguez at the relevant times. What is being questioned is whether Officer Svejcar used excessive force in accomplishing that task.

As noted above, Officer Svejcar's body blocks Dominguez from view for much of the interaction and there is no accompanying audio. Questions of fact exist as to the reasonableness of the amount of force used and the level of Dominguez's resistance throughout the interaction, whether that resistance was active or passive. Defendants make no attempt to explain why the strikes were reasonable or necessary. A reasonable jury could conclude that the force used by Officer Svejcar during the struggle to handcuff Dominguez was objectively unreasonable. Whether Officer Svejcar used excessive force against Dominguez, therefore, is a question to be resolved at trial.

### iii. The "4:37 AM Sequence of Force"

In this "sequence of force," during the struggle to handcuff Dominguez, Officer Manders tased Dominguez three times and Officer Svejcar struck Dominguez in the head three times. As with the earlier struggle with Officer Svejcar discussed above, a jury could reasonably conclude that the use of the taser and the strikes to Dominguez's head were excessive. While it is clear Dominguez was resisting, the level of resistance is not as clear. A jury must resolve the factual issues presented by this altercation.

### c. Qualified Immunity

Defendants contend they are entitled to qualified immunity even if they violated Dominguez's constitutional rights. "The doctrine of qualified immunity protects government officials from liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). The qualified immunity

inquiry involves two questions: (1) whether a plaintiff's constitutional rights have been violated; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

However, as already discussed, there are factual disputes which preclude the Court from determining whether the Defendant Officers used excessive force in violation of Dominguez's rights. In light of these factual disputes, it is impossible to determine whether the Defendant Officers' actions violated Dominguez's "clearly established" constitutional rights. *See*, *e.g.*, *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) ("When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial."); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[I]f the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made."). Accordingly, based on the record before the Court, the Court is unable to conclude that the Defendant Officers are entitled to qualified immunity. Defendants' motion for summary judgment is denied as to the excessive force claims.

## III.   Failure to Intervene

Because there are questions of fact as to whether the Defendant Officers used excessive force on Dominguez in violation of his constitutional rights, Defendants'

motion for summary judgment must also be denied with respect to the failure to intervene claims.

## IV.    Intentional Infliction of Emotional Distress

Under Illinois law, a plaintiff may recover damages for intentional infliction of emotional distress ("IIED") only if he establishes that (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269 (2003).

In defining the first element, the Illinois Supreme Court has held that "to qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Id.* at 274.  "To avoid imposing liability for the rough and tumble of unpleasant—but not law-breaking—behavior, the case law instructs that mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not amount to extreme and outrageous conduct, nor does conduct characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Richards v. U.S. Steel*, 869 F.3d 557, 566–67 (7th Cir. 2017) (cleaned up).  "And to avoid imposing liability for idiosyncratic and individualized reactions, '[w]hether conduct is extreme and outrageous is judged on an objective standard based on all the

facts and circumstances of a particular case.'" *Id.* (quoting *Franciski v. Univ. of Chi. Hosps.*, 338 F.3d 765, 769 (7th Cir. 2003)).

In situations involving use of force, courts have recognized that "[n]ot every battery will satisfy the extreme and outrageous element." *Whitney v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2019 WL 218801, at *9 (N.D. Ill. 2019). Indeed, the element is met only when "the force used . . . [is] very extreme or cause[s] very severe physical injury." *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1123 (N.D. Ill. 1997). This is a high bar, and one that cannot be crossed easily. *See, e.g., Whitney*, 2019 WL 218801, at *9 (granting summary judgment on IIED claim where officer struck plaintiff and used a choke hold to effectuate an arrest); *McDade v. City of Chi.*, 264 F. Supp. 2d 730, 732 (N.D. Ill. 2003) (granting summary judgment on IIED claim where officer shoved plaintiff against a porch railing); *DuFour-Dowell*, 969 F. Supp. at 1116 (dismissing IIED claim where officer "grabbed [plaintiff's] arm, gave her a hard jerk, and forced her face down on the floor with her arm behind her back"); *Carr v. Vill. of Richmond*, 1996 WL 663921, at *8 (N.D. Ill. 1996) (dismissing IIED claim where officer "slammed [plaintiff] against the trunk of the squad car, grabbed her by her ponytail, and threw her into the squad car," and explaining that "[e]ven if the force is unlawfully excessive, that alone does not make it extreme and outrageous").

Dominguez's intentional infliction of emotional distress claim is predicated on both the Defendant Officers' alleged use of excessive force as well as the alleged threats to sexually assault Dominguez's wife in front of him if he did not cooperate. Standing

23

alone, and if true, the alleged comments about Dominguez's wife, while vulgar and reprehensible, are insufficient to support a claim for intentional infliction of emotional distress. However, were a jury to conclude that the force used against Dominguez in the 2:40 AM and 4:37 AM sequences of force was excessive, a reasonable jury might also conclude that the Defendant Officers' conduct rose to the level of extreme and outrageous. Defendants' motion for summary judgment is denied as to the intentional infliction of emotional distress claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment [50] is granted in part and denied in part as set forth above. Status is set for 4/18/2023 at 9:50 a.m.

It is so ordered.

Dated: March 28, 2023

Charles P. Kocoras
United States District Judge

24